**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **SANDRA NAGY,**  <br><br>    **Plaintiff,**  <br><br>        v.  <br><br>**CORRECTIONS CORPORATION**  <br>**OF AMERICA,**  <br><br>    **Defendant.** | Civil Action No.  14-1658 (JEB) |

### MEMORANDUM OPINION

Plaintiff Sandra Nagy was arrested in January 2010 for trying to enter the White House without authorization.  She was then incarcerated at the Correctional Treatment Facility here in Washington, where she claims she was twice beaten by correctional officers.  Plaintiff filed suit against the District of Columbia and Corrections Corporation of America – the private entity that runs CTF – alleging violations of her constitutional rights together with related state-law claims.  This Court dismissed the District from the case, granted summary judgment in favor of CCA on Nagy's constitutional causes of action, and dismissed the remainder of the case for lack of subject-matter jurisdiction.  Plaintiff then re-filed her suit in D.C. Superior Court.  Her new Complaint included counts for negligence, negligent supervision, and intentional and negligent infliction of emotional distress.  CCA then removed the suit on diversity grounds and once again moves for summary judgment.  Because the Court finds that disputes of material fact remain, Nagy prevails this time.

I.      **Background**

As the Court set out the underlying facts of this case in a previous Opinion, see Nagy v. District of Columbia, No. 11-1446, ECF No. 47 (D.D.C. Aug. 14, 2014), it includes here only those necessary to adjudicate CCA's Motion. Because the parties rely on the factual record developed in that case, moreover, all citations throughout this section refer to the docket of that previously filed suit unless otherwise noted.

From January 28 to February 18, 2010, Nagy was incarcerated at CTF after attempting to enter the White House in the midst of an apparent psychotic episode. See Defendant's Statement of Facts (DSOF), ¶¶ 1, 2, 7, 8, 11, 125. According to Nagy, she was abused almost immediately upon arrival at CTF: two correctional officers grabbed her by the arms, took her to a locked cell, and threw her against the commode. See Opp., Exh. 1 (Deposition of Sandra Nagy) at 42:7-14. She landed sideways on her back, and the officers kicked her on her right side, broke her ribs, and bruised her body. See id. As one might naturally expect, Nagy found herself in "severe pain." Id. at 42:14. CCA vigorously denies this incident, but because this matter is before the Court on summary judgment, it is required to credit Nagy's testimony for purposes of resolving the Motion.

In the following days, Plaintiff's body showed signs of injury. On January 31, a correctional officer showed a mental-health nurse on the unit, Nurse Battle-Bey, a "red[] mark" on Nagy's chest. See Opp., Exh. 9 (Nagy Medical Reports) at 23. Nurse Battle-Bey recorded what she described as a "fresh wound/abrasion at [the] left breast plate" that was approximately three centimeters long. Id. Nagy told Battle-Bey at the time that "the tall officer with long [dreads] had [done] it," and that "the officer then threatened her if she should say anything about what happen[ed]." Id.; DSOF, ¶¶ 222, 223. A second nurse, Nurse Ahlrich, evaluated Nagy that

same day, and Plaintiff reiterated her story, claiming that she had been "hit in [the] chest multiple times, scratched on [the] chest [and] arms and had her hair pulled." DSOF, ¶¶ 225-26. A third nurse completed a body chart that identified four scratches on Nagy's arms, back, and chest. See id., ¶ 228. Chest x-rays completed on February 1, 2010, however, did not show any rib fractures. See id., ¶¶ 115, 117. On February 3, 2010, Plaintiff complained of pain on the right side of her chest to a doctor at CTF and said that it "hurt[] when she breathe[d] in and out . . . ." Nagy Medical Reports at 33.

Six days later, Plaintiff once again alleged that she had been assaulted "by staff and officers" – this time on February 8, and she showed a doctor at CTF, Ilse Levin, "bruising on both buttocks and hips regions" and "pointed to her right flank and reported pain there as well." Id. at 39. Dr. Levin observed bruises on Plaintiff's buttocks and hips "of varying stages, none that appeared newer than 2-3 days old with some yellowing and fading." DSOF, ¶ 268. She also noted scabs on Nagy's right shin and chest. Id., ¶¶ 102-04. CCA does not concede that any beating occurred here either. See id., ¶¶ 268-70.

In response to both instances, medical-service providers completed and submitted forms that are part of CCA's incident-reporting policy. See Opp., Exh. 6 (Reporting Policy) at 74 (including 13-34A2 forms as part of incident-reporting packet); id., Exh. 16 (Nagy's 13-34A forms). And it appears that, per CCA policy, such reports of physical abuse – whether to correctional officers or medical personnel – are supposed to be shared with the shift supervisor on duty. Id., Exh. 15 (Deposition of Rebecca Richards) at 56:18-62:13. There is no evidence, however, that any shift supervisor ever reviewed or considered the charts describing Nagy's injuries. See id.

Plaintiff was released from CTF on February 18, 2010.  See DSOF, ¶ 11.  According to her, she had a chest x-ray two days later that revealed rib fractures, and Dr. Levin testified that it frequently occurs that an initial chest x-ray does not reveal a fracture whereas a second one taken days or weeks later may.  See Pl. Resp. to DSOF, ¶¶ 117, 120.

Nagy filed her original Complaint on August 9, 2011, alleging both federal and state-law claims.  See ECF No. 1.  CCA moved for summary judgment on all counts, and, on August 14, 2014, this Court granted the Motion as to the federal claims and declined to exercise pendent jurisdiction over her state-law claims.  See ECF No. 47.  Plaintiff then re-filed these state-law claims in D.C. Superior Court, CCA removed the suit to this Court on diversity grounds, and it again moves for summary judgment.  The parties agree that no new discovery is needed, and they invite the Court to rule on the basis of the prior summary-judgment briefing together with short supplemental briefs.  See No. 14-1658, Minute Order of November 10, 2014.  The Court accepts that invitation now.

**II.   Legal Standard**

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006).  A fact is "material" if it is capable of affecting the substantive outcome of the litigation.  See Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895.  A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  See Scott v. Harris, 550 U.S. 372, 380 (2007); Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895.  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or

4

"showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

When a motion for summary judgment is under consideration, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." Liberty Lobby, 477 U.S. at 255; see also Mastro v. PEPCO, 447 F.3d 843, 850 (D.C. Cir. 2006); Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998) (*en banc*). On a motion for summary judgment, the Court must "eschew making credibility determinations or weighing the evidence." Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007).

The nonmoving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. See Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The nonmovant is required to provide evidence that would permit a reasonable jury to find in its favor. See Laningham v. Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987).

**III.     Analysis**

In her re-filed Complaint, Plaintiff asserted four counts against CCA: negligence, negligent supervision, intentional infliction of emotional distress, and negligent infliction of emotional distress. It appears, however, that she has abandoned any negligent-training, -monitoring, or -supervision claim, having failed to address CCA's arguments concerning those allegations in her Opposition or Surreply. See Def. Opp. to Surr. at 5 n.1. The Court treats the remaining three counts in turn.

   A.  Negligence

To show negligence, which is alleged in Count I, Plaintiff must establish "the applicable standard of care; a deviation from that standard; and a causal connection between such deviation and the injury." Edwards v. Okie Dokie, Inc., 473 F. Supp. 2d 31, 45 (D.D.C. 2007) (citing Hill v. Metropolitan African Methodist Episcopal Church, 779 A.2d 906, 908 (D.C. 2001)).  Nagy's negligence cause of action focuses on CCA's failure to follow up on her reports of mistreatment.  As she alleges, she was twice assaulted in prison, and, according to Plaintiff's penological expert, CTF officers should have submitted reports regarding these uses of force, and supervisory staff should have investigated them.  See No. 11-1446, ECF No. 36-1 (Expert Report of Eugene Miller) at 5-6.  Yet CCA "failed to act upon or investigate [Nagy's] complaints to any degree."  Compl., ¶¶ 21, 25; see also Richards Depo. at 56:18-62:13.  This failure constituted a breach of its duty, and, as a result, Plaintiff concludes that she "suffered multiple instances [of] physical abuse (and associated emotional distress) while held in Defendant['s] custody."  Id.

   CCA disagrees.  It first attacks her claim by questioning whether any mistreatment actually occurred.  It repeats time and again throughout briefing that Nagy's alleged assaults are "supported only by Plaintiff's self-serving and unsubstantiated testimony," Def. Opp. to Surr. at 7, which is "contradicted by all the other evidence in the record."  Id. at 6.  Although CCA implies that because Nagy is the only one attesting to abuse, the Court ought to conclude that it never occurred, this is not how summary judgment works.  Indeed, it is quite the opposite: at this stage of litigation, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor."  Liberty Lobby, 477 U.S. at 255.  Nagy's sworn testimony here is enough.

Defendant's second challenge goes to causation. Specifically, CCA argues that a failure of <u>after-the-fact</u> reporting or investigation could not possibly have caused injuries that occurred before such alleged breaches. This makes sense, but only in part. Defendant correctly points out that – with respect to injuries sustained in the <u>first</u> instance of alleged abuse – Nagy cannot show that any failure to follow up on that incident could have prevented its happening in the first place. For this reason, Plaintiff's negligence claim fails regarding the first alleged assault.

CCA's argument, however, does not apply to the second. For this one – if Plaintiff is to be believed – there <u>was</u> a breach that preceded the injury. And it is at least plausible that negligence in following up on the initial beating could have played a causal role in the subsequent incident. In other words, had Defendant acted within its standard of care, correctional officers may have been dissuaded from abusing Nagy the second time. As Nagy's expert opined, CCA's "failure to investigate . . . constituted a missed opportunity to prevent future inappropriate or excessive uses of force in that the improper actions by staff were not detected nor was appropriate disciplinary action taken . . . ." Report of Miller at 6.

CCA next contends that even this case cannot be made. It argues that even if a breach of duty could have played a causal role in the second assault, Plaintiff has not provided evidence that this second beating caused her specific injuries. <u>See</u> No. 11-1446, Mot. at 17-18. CCA notes that Plaintiff was often violent while imprisoned, suffered episodes of psychosis, and could have been injured in any number of ways while confined. "Expert testimony is necessary," it contends, "to demonstrate a causal link between a defendant's act and a plaintiff's harm 'in cases presenting medically complicated questions due to multiple and/or preexisting causes.'" <u>Halcomb v. Woods</u>, 610 F. Supp. 2d 77, 85 (D.D.C. 2009) (citing <u>Baltimore v. B.F. Goodrich Co.</u>, 545 A.2d 1228, 1231 (D.C. 1988) (requiring expert testimony as to causation where

plaintiff's depression and anxiety were potentially traceable to many sources)).  Without such testimony, CCA urges, a jury might engage in "speculation as to whether and to what extent the allegedly unlawful acts at issue – as distinct from other potential factors – caused plaintiff's harm."  Id. (internal quotations omitted).

Nagy's case, however, is much simpler than Defendant makes it.  She claims she was beaten by guards, and that this beating caused her injuries.  See No. 11-1446, Nagy Dep. at 83:7-8.  No expert is needed to link the two.  It is common sense that a prisoner abused by guards in the manner described by Nagy would suffer "physical injuries in the form of bruises and scratches, and severe emotional distress" as a result of such mistreatment.  See No. 11-1446, Opp. at 18-19.  Perhaps, as Defendant claims, some of the harm Nagy suffered could have resulted from other causes.  But this does not change the fact that a reasonable jury could find that some of her injuries resulted from the alleged assault.

In the end, Plaintiff has presented enough evidence for a jury to find that CCA negligently caused her injuries stemming from the second alleged assault by failing to follow up on the first.  This count survives summary judgment.

### B.  Intentional Infliction of Emotional Distress

Nagy's second claim is for intentional infliction of emotional distress.  The elements of IIED are (1) "'extreme or outrageous conduct' which (2) 'intentionally or recklessly' causes (3) 'severe emotional distress to another.'"  Joyner v. Sibley Mem'l Hosp., 826 A.2d 362, 373 (D.C. 2003) (quoting Kerrigan v. Britches of Georgetowne, 705 A.2d 624, 628 (D.C. 1997)).  The conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  Id. (internal quotation marks omitted).  Although not identified by either party, the

Court assumes that both this and the negligent-infliction-of-emotional-distress claim are based upon a *respondeat superior* theory.  See, e.g., Campbell v. Corr. Corp. of Am., No. 1999-1082, 2001 WL 921888, at *5 (Tenn. Ct. App. Aug. 7, 2001) ("CCA is the proper defendant for. . . torts arising from CCA's operation of correctional facilities or the acts of its employees.").

Nagy's case on this front is relatively straightforward.  She alleges that "Defendant's agents intentionally used excessive force in maliciously beating Ms. Nagy," causing injuries, as well as "severe emotional and mental distress," and that CCA "ignored Ms. Nagy's plight by not responding to or investigating her repeated reports of incidents of abuse," a failure that "was intentional and outrageous."  Compl., ¶¶ 27-28.  "To treat a mentally ill person in [this] manner," Plaintiff concludes, "is plainly 'beyond all possible bounds of decency.'"  No. 11-1446, Opp. at 20 (quoting Joyner, 826 A.2d at 373).

Defendant does not maintain that the purported beatings were not outrageous; instead, it again argues that, due to evidence of other possible causes of her injuries, Nagy cannot prove this claim absent expert testimony.  As was the case with negligence, however, Nagy's IIED case is simple enough to be decided by a jury.  She alleges that she was twice beaten, and that these beatings caused her mental anguish, evidenced by lingering nightmares about the assaults.  See No. 11-1446, Nagy Dep. at 83:7-8.  A reasonable jury could find the guards' use of force outrageous or extreme, and it is common sense that a prisoner abused by guards while in confinement could suffer severe emotional distress.  See, e.g., Anderson-Bey v. D.C., 466 F. Supp. 2d 51, 68 (D.D.C. 2006) (denying summary judgment on IIED claim where prisoners alleged officers applied "extremely uncomfortable and painful shackles for several hours, exacerbated by taunting, threats, and the denial of food, water, medicine, and toilets").

Because Nagy has provided evidence sufficient for a reasonable jury to find that she was injured by outrageous behavior on the part of Defendant, summary judgment is unwarranted on this count.

### C. Negligent Infliction of Emotional Distress

Plaintiff's final count alleges negligent infliction of emotional distress.  To prevail on an NIED claim, she "must prove (1) that [Defendant] acted negligently, (2) that [she] suffered either a physical impact or [was] within the 'zone of danger' of the officers' actions, and (3) that [she] suffered emotional distress that was 'serious and verifiable.'"  Wright v. United States, 963 F. Supp. 7, 18 (D.D.C. 1997) (quoting Jones v. Howard University, Inc., 589 A.2d 419, 424 (D.C. 1991)).  Given the analysis above, it is clear that this claim survives summary judgment as well.  The same conduct a jury could find outrageous in the context of IIED – namely, the guard's handling of Nagy – could be found negligent, even if not intentionally harmful.  And this negligence, by Plaintiff's account, physically injured her, resulting in serious emotional distress.  As in the IIED context, no expert testimony is needed, as the causal connections are of a commonsense variety.  The Court, therefore, will deny summary judgment on this count as well.

## IV. Conclusion

The Court repeats its prior caveat that it offers no opinion on whether either of these beatings actually occurred, and there is certainly plenty of evidence indicating that they did not.  At this stage, however, the Court must credit Nagy and permit her claims to proceed to trial.  The Court, therefore, will issue an order this day denying Defendant's Motion for Summary Judgment.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date: February 4, 2015